Robert E. GREENE, Acting Regional Director of the First Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner

v.

INTERNATIONAL TYPOGRAPHICAL UNION, and Local 285, Ansonia Typographical Union, International Typographical Union, Respondents.

No. 8136.

United States District Court
D. Connecticut.

Jan. 8, 1960.

Stuart Rothman, General Counsel, Thomas J. McDermott, Asso. Gen. Counsel, Winthrop A. Johns, Assist. Gen. Counsel, Julius G. Serot, Washington, D. C., Robert S. Fuchs, Boston, Mass., Eugene R. Jackson, Joseph I. Nachman, N. L. R. B., Washington, D. C., for petitioner.

Norman Zolot, Hamden, Conn., for Local 285, ITU, Gerhard Van Arkel, Washington, D. C., specially appearing, for respondents.

ANDERSON, District Judge.

1. Petitioner is Acting Regional Director of the First Region of the Board, an agency of the United States, and filed the petition herein for and on behalf of the Board.

2. On or about December 14, 1959, Charlton Press, Inc. (herein called Charlton), pursuant to the provisions of the Act, filed a charge with the Board alleging, *inter alia*, that International Typographical Union, and Local 285, Ansonia Typographical Union, International Typographical Union (herein called International and Local 285 respectively), labor organizations, have engaged in, and are engaging in, unfair labor practices within the meaning of § 8(b) (7) subparagraph (C), of the Act, 29 U.S.C.A. § 158(b) (7) (C).

3. The aforesaid charge was referred to petitioner as Acting Regional Director of the First Region of the Board.

4. There is, and petitioner has, reasonable cause to believe that:

(a) Respondent Local 285, an unincorporated association, is an organization in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

(b) Respondent Local 285 maintains its principal offices at Shelton, Connecticut, and at all times material herein has been engaged within this judicial district in transacting business and in promoting and protecting the interests of their employee members.

(c) Charlton is engaged at Derby, Connecticut, in the printing, sale and distribution of magazines, books and other literature. In the operation of its business, Charlton annually receives goods and materials from outside the State of Connecticut valued at in excess of $50,000, and annually ships products outside the State of Connecticut valued at in excess of $50,000.

(d) Local 285 is not currently certified as the representative of any of Charlton's employees.

(e) On or about December 18, 1959 respondent filed with the Board a charge under § 8(a) (2) of the Act alleging that Charlton has unlawfully recognized or assisted another labor organization.

(f) The aforesaid charge was referred to the petitioner as Acting Regional Director of the First Region of the Board and was dismissed by petitioner for lack of merit.

(g) Respondent, at various times since on or about February 24, 1959 has demanded that Charlton recognize and bargain with respondent as the representative of Charlton's composing room employees.

(h) In furtherance of the aforesaid demands for recognition and bargaining, respondent, Local 285, since on or about March 9, 1959 has picketed Charlton's premises.

(i) The aforesaid picketing has been conducted for more than thirty (30) days from November 13, 1959 without the filing of a petition under § 9(c) of the Act, 29 U.S.C.A. § 159(c) for a Board election.

(j) The aforesaid picketing has induced individuals employed by other employers not to make pickups or deliveries at Charlton's premises, or perform services at such premises.

(k) An object of the picketing set forth in Findings of Fact 4(h), (i), and (j) above, has been and is to force or require Charlton to recognize or bargain with respondent Local 285 as the representative of Charlton's composing room employees, notwithstanding that it is not currently certified as the representative of such employees.

(l) By its picketing since November 13, 1959 as described in Findings of Fact 4(h), (i), (j), and (k) above, respondent Local 285 has engaged in, and is engaging in, acts and conduct in violation of § 8(b)(7), subparagraph (C), of the Act.

(m) The acts and conduct of respondent Local 285 set forth in Findings of Fact 4(h), (i), (j), (k), and (l) above, occurring in connection with the operations of Charlton, have a close, intimate, and substantial relation to trade, traffic, and commerce among the several States and tend to lead to and do lead to labor disputes burdening and obstructing commerce and the free flow of commerce.

5. It may fairly be anticipated that, unless enjoined, respondent will continue and repeat the acts and conduct set forth in Findings of Fact 4(h), (i), (j), (k), and (l) above, or similar or like acts and conduct.

### Conclusions of Law

1. This Court has jurisdiction of the parties and of the subject matter of this proceeding, and under § 10(l) of the Act, 29 U.S.C.A. § 160(l) is empowered to grant injunctive relief.

2. There is, and petitioner has, reasonable cause to believe that: (a) Respondent Local 285 is a labor organization within the meaning of §§ 2(5), 8(b) and 10(l) of the Act; (b) Charlton is engaged in commerce within the meaning of §§ 2(6) and (7) of the Act, 29 U.S.C. A. § 152(6, 7); and (c) Respondent Local 285 has engaged in unfair labor practices within the meaning of § 8(b)(7) subparagraph (C), of the Act, affecting commerce within the meaning of §§ 2(6) and (7) of the Act, and a continuation of these practices will impair the policies of the Act as set forth in § 1(b), 29 U.S. C.A. § 151(b) thereof.

3. To preserve the issues for a prompt and orderly determination by the Board, it is appropriate, just and proper that, pending the final disposition of the matters herein involved pending before the Board, Respondent Local 285, its officers, representatives, agents, servants, employees, attorneys, and all members and persons acting in concert or participation with it, be enjoined and restrained from the commission, continuation, or repetition of the acts and conduct set forth in Findings of Fact 4(h), (i), (j), (k), and (l) above, acts or conduct in furtherance or support thereof, subject, however, to the provisos set forth in said § 8(b)(7)(C). Said temporary injunction will remain operative for ninety (90) days or until the final disposition by the Board of the matters pending, whichever is sooner; provided that if for reasons beyond its control, the Board is unable to make such final disposition within said ninety (90) days, then within fifteen (15) days before the end of said ninety (90) day period it may be heard on a petition to extend the temporary injunction for such further period as may be deemed just under the circumstances.

### Discussion.

The question before the court stems from a controversy between the employer, Charlton Press, and the respondent, Local 285, which arose in February of 1959 when, respondent claims, all the eight employees of Charlton's composing room became members of the respondent Local following which the employer discharged these eight employees. The Union

charged Charlton, the employer, with an unfair labor practice and a hearing on this issue was held before a trial examiner who, on July 28, 1959, found the employer guilty of an unfair labor practice. While in his report the trial examiner recommended restoration of pay, there was no recommendation as to reinstatement because the employer agreed to restore the discharged men to their former or equivalent positions. It is undisputed that the men refused to be reinstated unless the Union was given recognition, a stipulation which the employer would not consider. Thereafter, in August the Union again petitioned the N.L.R.B. charging Charlton Press, Inc. with an unfair labor practice and with refusing to reinstate the employees. The Board recommended that the charges be withdrawn and the Union withdrew them. This was on the eve of the new amendments to the Labor Management Relations Act which was passed on September 13, 1959 and which took effect on November 13, 1959. Picketing continued through this entire period and is still going on. The thirty day period provided in § 8(b)(7)(C) commenced on November 13, 1959. After the thirty days had expired the Union, on December 15, 1959, filed a petition for an immediate election under § 8(b) (7) (C).

The Union's position is that § 8(b)(7)(C) does not apply to it under the circumstances of this case because it *in fact* has in its membership 100% of the employees of the Charlton Press's composing room and these employees *in fact* are an appropriate bargaining unit, and that it is endeavoring to meet an § 8(a) (5) violation by the employer. While the main thrust of this new amendment to the Labor Management Relations Act was to prevent recognition picketing by a union representing a minority of employees or none at all, § 8(b) (7) (C) simply sets up a procedure whereby the factual qualifications of a union to act as the representative of a group of employees is to be determined by the N.L.R.B. The Union urges that no such accelerated election under a § 8(b)(7) (C) proceeding is needed or called for when the union represents a majority of employees in defending against an § 8(a) (5) violation and that this should be a defense to the § 8(b) (7) proceeding; moreover, that it will be timely enough to pass upon the question of majority representation when the Board hears the § 8(b) (7) charge. However, this would obviously be very much less effective in meeting the improper practices sought to be corrected; and Congress plainly felt that it was in the public interest to have the question of majority or minority representation determined at an early stage by a speedy election. The burden of going through the proceedings falls upon those who are in fact right as well as those who are in fact wrong—something which is common to nearly all parties who appear before fact-finding tribunals.

The Amendment is consistent with Congress's comprehensive plan to protect the rights of employees and employers, and to stabilize labor relations, and to provide for the orderly resolution of disputes over representation of employees by requiring that such questions be settled by a proper tribunal rather than through coercive activities by the antagonists.

In arguing that there is no necessity for this early stage election the Union said, by way of example, that everyone, including an employer, can ascertain whether the union represents a majority or not by counting the number out on strike, but Congress may well have considered that one or more employees might, for reasons best known to themselves or in response to influences brought to bear upon them, walk out with the strikers and yet in the secret ballot of the election, vote against representation by the union; or the employees might do the exact opposite by refusing to strike but vote for representation by the union. There are other imponderables which make ascertainment of the truth at such a time difficult, and it is reasonable to suppose that Congress felt it desirable to have the qualifying facts

determined by the N.L.R.B. at this early point in the disagreement rather than to leave it to the parties in interest to fight it out or to guess at their peril what the facts might be.

The Union repeatedly refers to § 8(b)(7)(C) as a *bar* to picketing against an employer's unfair labor practice, but this is an overstatement. The Union concedes in the present case that it is engaged in recognition picketing and the law provides that where this is so, even though the same picketing may have other objects as well, the union must have qualified for certification as the representative of the employees or to have petitioned for such certification if the picketing is to continue for more than thirty days. If the facts of the present case are as the Union says they are, and within the thirty days it had filed a petition under § 9(c), its picketing would not have been interrupted at all. It now faces a temporary injunction, not because the law sets up a bar to picketing against an employer's unfair labor practices, but because the Union, after it embarked upon recognition picketing, disregarded or refused to follow the procedure under § 8(b)(7)(C). Why it let the thirty days go by without doing anything remains unexplained.

It does appear likely that the Board would have found the employer initially guilty of an unfair labor practice and the Union, therefore, feels that it is proceeding from strength in pressing the fireside equity flowing from its claims that the employer "started all this", and not without reason; but it let go the tactical achievement of reinstatement for the more desirable and principal objective of recognition prior to the enactment of § 8(b)(7). After November 13, 1959, by failing to petition within thirty days under § 9(c), it sacrificed the tactical achievement of speedy certification for the purpose of posing the strategic issue here presented, i. e. an attack on the scope and validity of § 8(b)(7), by confronting its picketing with a possible if not probable temporary injunction. Therefore, in spite of the likelihood of grave fault on the part of the employer, there is at least a partial unreality to the claims of inequity; for, if all the Union says is correct, the picketing could have continued without interruption had the Union but followed the procedure proscribed.

■ The Union urges that Congress never intended that § 8(b)(7) should apply where any § 8(a) violation was charged.

The proviso in § 10(*l*), prohibiting the application for a restraining order under § 8(b)(7), if there is reason to believe § 8(a)(2) violation exists, coupled with the record of the proposal by Senator Kennedy to the Conference Committee that any § 8(a) violation should be a defense to an application for a restraining order and to any complaint issued under § 10(b) and its rejection of that suggestion, shows that Congress considered the relationship of § 8(b)(7) to coincidental § 8(a) violations and pointedly did not treat the existence of a § 8(a)(5) violation as relieving the union of the necessity of qualifying under or proceeding in accordance with § 8(b)(7). If the Union's claim were correct, the effectiveness of § 8(b)(7) could easily be reduced to nothing by raising a § 8(a) issue every time recognition picketing was sought to be controlled.

■ The assertion by the Union that § 8(b)(7)(C) is in violation of the First Amendment to the Constitution protecting freedom of speech, is untenable. Picketing for the purpose of truthfully advising the public that an employer does not employ members of or have a contract with a labor organization is expressly excepted. The effect of the amendment in limiting recognition picketing to currently certified representatives of employees and those who within thirty days from the commencement of the picketing have petitioned for certification under § 9(c) and in prescribing machinery through which only those representing a majority of employees may be certified and freely continue recognition picketing, is not unconstitutional as abridging the First Amendment because

the only picketing proscribed is that by the claimed representatives of a minority of employees who are prevented, not from telling the public that the employer does not employ their members or have a contract with them, but from imposing economic coercion to force or require recognition or bargaining upon the employer or upon other employees who are not allied with them, or both. Experience has shown the existence of the latter type of picketing to be an evil which Congress has sought to correct by a law which does no more than establish a means of meeting that particular wrong.

Because illegal conduct may include the incidental use of written or spoken words, the wrongdoer cannot therefor find sanctuary in the Constitution.

The Union argues it is not the wrongdoer but the wronged. However, it is not faced with a temporary injunction because it had a dispute with an employer over what it claims was an unfair labor practice in discharging eight employees, but because the Union has refused to follow the reasonable procedures provided by law to qualify it to continue organizational picketing.

While due consideration has to be made for the heavy docket of the Board, it does not seem just to require the Union to suffer what could well be the very drastic, if not fatal, consequences of a delay of many months in determining its status. It is true that the Union let its opportunity for a speedy election go by in delaying the filing of its petition beyond the thirty day period, but in its broadest aspects the Union looks upon this new amendment as part of a movement to remove from it the flexibility of the right to strike and picket in compelling collective bargaining and in support of its collective bargaining claims and to require that all labor-management issues be resolved by courts, commissions or boards. It is not unreasonable to suppose that such a movement exists, but there is nothing to show that Congress was in any way affected by it or motivated by it in enacting the new amendments. However, the issue in the present case is an important one to the Union and one which it has a right to have adjudicated promptly. Its violation here might be described as technical in view of the fact that an unfair labor practice by the employer probably existed; and, as there is probable cause to believe that the Union in fact represented a majority of the employees at the time the picketing commenced, its conduct is not at the heart of the evil at which Congress aimed. Moreover, this is not a situation which arose after the passage of the 1959 amendments and in full knowledge of them. The changes in the law ran athwart the picketing which started in February of 1959 and has continued to the present time. A large share of the brunt of getting a clarification of this new law falls upon the employees immediately involved. It appears, therefore, that some limit should be placed on the time within which the temporary injunction will remain effective subject to such later modification as may then seem to be fair to the parties.

The motion to dismiss is denied and the temporary injunction may issue in accordance with ¶ 3 of the Conclusions of Law.

Ruling on International Typographical Union's Motion to Dismiss and Findings of Fact and Conclusions of Law on the Board's Petition for Temporary Injunction.

1. The motion to dismiss is denied.

2. The Court finds that Respondent International Typographical Union maintains its principal offices in Indianapolis, Indiana, and has at all times material herein, been engaged in this judicial district in transacting business and in promoting and protecting the interests of its employee members and/or members of affiliated Local 285 and the facts found in Paragraphs 1, 3, 4(a), 4(c), 4(d), 4(e), 4(f), 4(g), 4(h), 4(i), 4(j), 4(k), 4(l), 4(m) and 5 as to the Respondent Local 285 are found as to the Respondent International Typographical Union.

The Conclusions of Law reached as to the Respondent Local 285 are hereby made the Conclusions of Law reached as to the Respondent International Typographical Union, and the temporary injunction described in ¶ 3 thereof, may issue.