NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LOCAL 25, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, Respondent.

Nos. 32, 34, Dockets 31086, 31089.

United States Court of Appeals Second Circuit.

Submitted Sept. 25, 1967.

Decided Oct. 11, 1967.

Arnold Ordman, General Counsel, Washington, D. C. (Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Gary Green and Robert S. Hillman, National Labor Relations Board, Washington, D. C.), submitted brief for petitioner.

Ernest Fleischman, New York City (Delson & Gordon, David Kramer, New York City), submitted brief for respondent.

Before MOORE, SMITH and KAUFMAN, Circuit Judges.

MOORE, Circuit Judge:

This is a petition by the National Labor Relations Board for enforcement of its orders prohibiting Local 25, IBEW ("Local 25") from violating Section 8(b) (4) (i) (ii) (D) (29 U.S.C. § 158(b) (4) (i) (ii) (D)),[1] of the National Labor Relations Act by threatening to picket, or by picketing, any employer (as well as two specified employers), where an object of such picketing is to force the assignment of electrical work in construction projects to employees represented by Local 25. The specified employers, Sarrow-Suburban Electric Co. ("Sarrow-Suburban") and Emmett Electric Co. ("Emmett"), were the charging parties in two separate proceedings before the Board which have been consolidated for purposes of this enforcement petition. The facts of the two cases, while presenting the same issues, shall be considered separately.

*Sarrow-Suburban*

Dr. Benjamin Stein, owner of the Brunswick Hospital Center, acted as his own general contractor in the building of an addition to the hospital. Although approached in May or June, 1965, by a Local 25 business agent and given a list of Local 25 contractors, Dr. Stein subcontracted the electrical work to Sarrow-Suburban, which executed a collective bargaining agreement with Local 199, In-

1. 29 U.S.C. § 158(b) (4) (i) (ii) (D):
    "(b) It shall be an unfair labor practice for a labor organization or its agents—
    *       *       *       *       *
    (4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or
    (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
    *       *       *       *       *
    (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work."

dustrial Workers of Allied Trades, a so-called independent union, not affiliated with the AFL-CIO.

After Sarrow-Suburban started work in August, Dr. Stein was told by two Local 25 agents, on separate occasions, that he should break his contract with Sarrow-Suburban, and that, if he did not, there would be "trouble" and work stoppages. At no time was any mention made to anyone of any differential in wages and working conditions between Local 25 and Local 199. Joseph Bermel, a business agent of Local 25, stated that it was one of his duties to visit new construction jobs and see that all the electrical work was done by members of Local 25. He stated to Dr. Stein that Sarrow-Suburban could not work on the job and that the work must be done by a Local 25 man.

Sarrow-Suburban continued on the job, and on September 3, 1964, Local 25 started picketing with "informational" type signs reading:

TO THE PUBLIC
_____

The Electricians Employed By
SARROW
SUBURBAN ELECTRIC INC.
are not working under wages
and conditions established by
LOCAL UNION 25, IBEW
AFL–CIO
We have no dispute with any
other employer
at this site.

The picketing caused work stoppages due to employees of other subcontractors refusing to cross the picket line. The picketing was enjoined on October 9 at the request of the Board.

Thereafter, the Board conducted a Section 10(k) (29 U.S.C. § 160(k)) [2] jurisdictional dispute hearing to determine which union should be awarded the work. Local 25, contending that there was no jurisdictional dispute, stipulated that Local 199 should be awarded the work if any award was to be made. It does not appeal the resulting award to employees represented by Local 199. Since Local 25 refused to refrain from the conduct proscribed by the Board at the Section 10(k) hearing, another hearing was held. The Board concluded that a violation of Section 8(b) (4) (D) had occurred and issued its order (Member Fanning dissenting) which it seeks to have enforced here.

*Emmett Electric*

In July or August, 1964, the D-Lion Construction Co. was the general contractor for a new building on the premises of the East End Synagogue in Long Beach, New York. D-Lion engaged Emmett, a Local 199 contractor, to do the electrical work. On September 14 or 15, 1964, Joseph Cavanaugh, a business agent of Local 25, visited the project and inquired of Mario Tucci, D-Lion's superintendent on the job, as to who was doing the electrical work. After checking that Emmett was not on the list of Local 25 contractors, Cavanaugh told Tucci that if D-Lion did not get a Local 25 man, the union would have pickets on the job. No discussion of comparative salaries or benefits took place with Tucci or Emmett.

Local 25 began picketing on September 16, 1964, with "informational" signs of the same type used in Sarrow-Suburban, and continued to picket until Emmett left the job ten days later. Craftsmen re-

2. 29 U.S.C. § 160(k):
"(k) Hearings on jurisdictional strikes. Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such

charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed."

spected the picket line, causing work stoppages. During the picketing Cavanaugh stated to a D-Lion officer that he was "protecting what Local 25 has taken some thirty-odd years to build up," and that the pickets would not be removed until D-Lion engaged a Local 25 contractor— which D-Lion eventually did. At the Board hearing, Cavanaugh stated that he was concerned with increasing job opportunities for Local 25 members and that it was his practice to protest the employment of any electricians other than Local 25 members on any job in his district.

The Board conducted a Section 10(k) hearing and, as in Sarrow-Suburban, the work was awarded by stipulation to Local 199 members with Local 25 refusing, however, to refrain from the conduct proscribed by the Board. Thereafter, the Board held that Local 25 had violated Section 8(b) (4) (D) and issued its order (Member Fanning dissenting) which it seeks to have enforced here.

Substantial evidence in both cases supports the Board's conclusion that Local 25 was attempting to obtain jobs for its members by insisting that the electrical work being done by the Local 199 contractor be assigned to a Local 25 contractor. In determining the objectives of Local 25, the Board is entitled to look to the totality of the union's conduct, and it is not bound by the union's signs or professed object in picketing. See NLRB v. Local 182, Int'l Bro. of Teamsters, etc., 314 F.2d 53, 58 (2d Cir. 1963); Brown Transport v. NLRB, 334 F.2d 30, 38 (5th Cir. 1964). The fact that the union might have had other, valid reasons for picketing—e. g., to enforce area standards—does not absolve it from having an illegal objective. NLRB v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); NLRB v. Milk Drivers, etc. Local Union No. 584, 341 F.2d 29, 32 (2d Cir. 1965), cert. denied 382 U.S. 816, 86 S.Ct. 39, 15 L.Ed.2d 64 (1965); Local 35, 125 NLRB 1, 5 (1959).

The Board could properly conclude from the facts in both cases that the picketing by Local 25 induced or encouraged employees in the course of their employment to refuse to work (Section 8(b) (4) (i)) and threatened, coerced or restrained an employer (Section 8(b) (4) (ii)) for the above proscribed object. See NLRB v. Local 25, Int. Bro. of Electrical Workers (A. C. Electric), 351 F.2d 593 (2d Cir. 1965); National Maritime Union of America v. NLRB, 342 F.2d 538 (2d Cir.), cert. denied, 382 U.S. 835, 86 S.Ct. 78, 15 L.Ed.2d 78 (1965). The union made no attempt to insure that the picketing did not "induce or encourage" other employees to engage in a work stoppage. See National Maritime Union v. NLRB, supra; compare NLRB v. Fruit & Vegetable Packers Local 760 (Tree Fruits), 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964). While the signs used by the union were of the informational type, they were sufficiently ambiguous that the Board could reasonably find that they were being used as a signal to strike. This type of sham informational picketing has been held illegal. Local 25, IBEW (A. C. Electric), 148 NLRB 1560 (1964), enforced per curiam, 351 F.2d 593 (2d Cir. 1965); National Maritime Union of America v. NLRB, supra.

The main issue in this case is whether Local 25 was engaged in a jurisdictional dispute within the meaning of Section 10(k) and Section 8(b) (4) (D) of the Act. In both cases, the union expressly agreed at the Section 10(k) hearing that the Board should assign the disputed work to employees represented by Local 199 if it found a jurisdictional dispute to exist. By this maneuver Local 25 hoped to thwart the Board from making a binding determination. The union correctly points out that Section 8(b) (4) (D) must be read in conjunction with, and is limited by, Section 10(k). NLRB v. Radio & Television Broadcasting Engineers Union, Local 1212 (the *CBS* case), 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed. 2d 302 (1962). The union argues that these sections, as construed in the *CBS* case, require two or more employee groups actively claiming the right to per-

form certain work tasks for an employer. Since neither Union was actively claiming the work in the usual way—by pointing to skills, area practice, etc., Local 25 contends that there is, therefore, no jurisdictional dispute to be resolved, and that its only dispute was with the subcontractor. Respondent cites Highway Truckdrivers & Helpers, Local 107 (Safeway Stores), 134 NLRB 1320 (1961); Wood, Wire & Metal Lathers Local No. 328 (Acoustics & Specialties, Inc.), 139 NLRB 598 (1962); Penello v. Local Union No. 59, etc., 195 F.Supp. 458 (D. Del.1961); Hull v. American Wire Weavers' Protective Assoc., 159 F.Supp. 425 (N.D.Ohio 1957), and similar cases in support of this position. See generally Attleson, The NLRB and Jurisdictional Disputes: The Aftermath of CBS, 53 Georgetown L.J. 93, 102–110; 146–148 (1964).

■ This argument must be rejected because (1) there is substantial evidence that Local 25 was demanding an assignment of the work in question, and (2) Local 199 was obviously interested in having its members work on the job which the subcontractor in question had contracted to do. The prior decisions of the Board and District Courts cited by respondent to support its narrow view of the scope of the jurisdictional dispute section (§ 10(k)) are distinguishable. Where the resolution of a controversy requires the employer to assign certain work to one union or group, rather than another union or group, and where one union cannot show by disclaimer or other proof that the other union or group has no substantial interest in the work, the dispute clearly comes within the terms and intent of Sections 10(k) and 8(b) (4) (D) of the Act which gives the Board authority to resolve jurisdictional disputes.[3]

■ Unlike the situations presented in the cases cited by respondent, Local 199 and Local 25, both have a strong interest in the work. Emmett had a contract to do the electric work and its employees worked and were paid therefor even after Local 25 began to picket. No disclaimer of the work was made by Emmett or its employees, and both Emmett and Local 199 sought redress from the NLRB. Substantially the same situation is present in Sarrow-Suburban. In fact, the cases are strikingly similar to Local 639, IBEW (Bendix Corp.), 138 NLRB 689 (1962), where the Board found, Member Fanning dissenting (as he did in these cases), that a jurisdictional dispute existed. See also Local 978, United Bro. of Carpenters & Joiners etc. v. Markwell, 305 F.2d 38, 47 (8th Cir. 1962) ("While § 158 (b) (4) (D) and its counterpart § 187 (a) (4) are of particular aid in disputes involving two rival unions within an employer organization, it is clear that those sections are also applicable when the dispute might be said to be solely between an employer and a union." [citations omitted]).

■ Respondent argues that the Board should have proceeded under § 8 (b) (4) (i) (ii) (B) (the secondary boycott section) because both of the instant cases present instances of secondary pressure, i. e., forcing the general contractor "to cease doing business with any other person"—the electrical subcontractor. However, it is clear that the same conduct can violate both sections at the same time, and that in such cases the Board is not restricted to one or the other. Local No. 5, United Ass'n of Journeymen etc. v. NLRB, 116 U.S.App.D.C. 100, 321 F.2d 366, cert. denied, 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963); Local 1978, United Bro. of Carpenters & Joiners etc. v. Markwell, supra; cf. NLRB v. Local 825, Int'l Union of Operating Engineers, 326 F.2d 213, 215–216, 219 (3rd Cir. 1964).

■ Finally, Local 25 argues that the Board's remedial order is too broad. This contention is without merit in light of the Board's finding that the specific

---

3. We need not decide whether the statute also covers a case where there is such proof or disclaimer.

violations found here derive from a generalized campaign and that a prohibition directed solely against threats and picketing of the general contractors in the instant cases would be inadequate to guard against such a campaign. See also Local 25, IBEW (A. C. Electric), supra.

Enforcement granted.