Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LOCAL 478, INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL–CIO, Respondent.

Civ. No. 12241.

United States District Court
D. Connecticut.

Nov. 30, 1967.

Winifred D. Morio, Atty., New York City (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Julius G. Serot, Asst. Gen. Counsel, Washington D. C., and Sidney Danielson, Regional Atty., Region 2, New York City, on the brief), for petitioner.

Norman Zolot, Hamden, Conn., for respondent.

John F. Picket, Middletown, Conn., for Utility Service Corp.

TIMBERS, Chief Judge.

## QUESTIONS PRESENTED

Petitioner, Regional Director of the Second Region of the National Labor Relations Board (the Board), seeks a preliminary injunction against Local 478, International Union of Operating Engineers, pursuant to Section 10($l$) of the National Labor Relations Act (the Act), 29 U.S.C. § 160($l$), pending final disposition of the matters herein which are before the Board.

The essential questions presented are (1) whether a preliminary injunction "would be 'just and proper' in terms of general equitable principles", and (2) whether the Regional Director has "reasonable cause" to believe that respondent has engaged in the unfair labor practices charged and "that a complaint should issue." [1]

Having held evidentiary hearings on November 20, 21 and 22, 1967, at which all parties were afforded full opportunity to be heard and to present evidence on the issues, and having fully considered the petition, answer, evidence, arguments and briefs of counsel, the Court is of the opinion that the instant petition for preliminary injunction should be granted.

---

1. McLeod v. Local 25, Int'l Bhd. of Elec. Workers, 344 F.2d 634, 638 (2 Cir. 1965); see N.L.R.B. v. Local 25, Int'l Bhd. of Elec. Workers, 383 F.2d 449 (2 Cir. 1967), for subsequent enforcement of the Board's orders prohibiting respondent from violating Section 8(b) (4) (i), (ii) (D) of the Act.

Upon the entire record, the Court makes the following findings of fact and conclusions of law, pursuant to Rule 52 (a), Fed.R.Civ.P., constituting the grounds of the Court's action in this case.

## FINDINGS OF FACT

1. Petitioner is Regional Director of the Second Region of the Board, an agency of the United States, and files this petition for and on behalf of the Board.

2. On November 3, 1967, Utility Service Corporation (Utility), pursuant to provisions of the Act, filed a charge with the Board alleging that respondent above-named, a labor organization, has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(b) (4) (ii) (D) of the Act.

3. The aforesaid charge was referred to petitioner as Regional Director of the Second Region of the Board.

4. There is, and petitioner has, reasonable cause to believe that:

(a) Respondent, an unincorporated association (Local 478), is an organization in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

(b) Local 478 maintains its offices at 1965 Dixwell Avenue, Hamden, Connecticut, and at all times material herein has been engaged within the District of Connecticut in transacting business and in promoting and protecting the interests of its employee members.

(c) Utility, a New Jersey corporation, with its place of business at 169 East Highland Parkway, Roselle, New Jersey, is engaged in the business of installing underground power cables for utility companies. It does a gross annual business in excess of $1,000,000, a substantial portion of which is performed outside the State of New Jersey. In the operation of its business, Utility annually purchases goods and materials in excess of $50,000 from points outside the State of New Jersey.

(d) Paul Bacco and Sons, Inc. (Bacco), a Connecticut corporation, is engaged in the excavation business. It does a gross annual business in excess of $1,000,000. In the operation of its business, Bacco annually receives equipment and material in excess of $50,000 from points outside the State of Connecticut.

(e) In September 1967, Utility executed a contract with Hartford Electric Light Company (HELCO), a public utility company, to install pipes as conduits for 138 volt cable and to install the cable underground, from a point on Hamilton Avenue extending five miles to a substation to be located at Cedar Heights, all in Stamford, Connecticut.

(f) Utility, in the performance of its contract for HELCO, is required to excavate, install and weld conduits and then refill the excavated area. Upon the completion of this phase of the operation, Utility will then pull the cable through and pump oil into the conduit. Performance of these various operations requires Utility to utilize a hydro-lift, a welding machine, a cable pulling winch and vacuum pumps.

(g) Utility has subcontracted to Bacco the excavation work, back-filling and replacement of all pavement, sidewalk and roads on this project.

(h) Bacco's employees, who operate the mechanical shovel and payloaders, are members of Local 478.

(i) Utility commenced work on or about October 18, 1967. It assigned to its employees who are members of Local 501, International Brotherhood of Electrical Workers, AFL–CIO (Local 501), the work (1) of operating a hydro-lift to lay pipes for the cable in the area excavated by employees of Bacco, and (2) of operating a welding machine to weld the pipes together, including the pressing of the button that starts and stops the welding machine.

(j) On or about October 24, Local 478's business agent told Bacco that he

wanted a member of Local 478 on the hydro-lift; that if a Local 501 member continued to operate the hydro-lift there would be pickets; and that Bacco's employees, members of Local 478, knew the by-laws of Local 478.

(k) On or about October 24, Local 478's business agent told Utility that there would be pickets on the job site if Utility continued to assign a member of Local 501 rather than a member of Local 478 to operate the hydro-lift.

(l) On or about October 31, Local 478's business agents and other representatives told Utility that there would be pickets on the job site if the work of operating the hydro-lift, the cable pulling winch and the vacuum pumps, and the work of starting and stopping the welding machine, was not assigned to members of Local 478 rather than to members of Local 501.

(m) By the acts and conduct set forth in sub-paragraphs (j), (k) and (l) above, respondent has threatened, coerced and restrained Utility and other persons engaged in commerce or in an industry affecting commerce.

(n) An object of respondent's acts and conduct set forth in sub-paragraphs (j), (k), (l) and (m) above was to force or require Utility to assign the operation of the hydro-lift, welding machine, cable pulling winch and vacuum pumps on the aforesaid job to employees who are members of, or represented by, respondent rather than to employees who are members of, or represented by, Local 501 or who are not members of, or represented by, respondent.

(o) Respondent has not been certified by the Board as the bargaining representative for the employees performing the work described above in sub-paragraph (n), nor has the Board issued an order directing Utility to bargain with respondent as the representative of the employees performing such work.

5. Because of respondent's actions, work at the Stamford job site was brought to a complete halt for at least a portion of the period from October 25, 1967 to November 7, 1967.

6. Because of respondent's actions, although work is now proceeding at the Stamford job site, it is proceeding inefficiently and uneconomically.

7. Prompt completion of this cable laying project is necessary to provide needed additional electrical power in the Stamford area and is, therefore, in the public interest.

8. As a result of the work stoppage and present inefficient work procedure, trench has remained open and unfilled, and continues to remain open and unfilled, and as such constitutes a definite inconvenience and danger to the people of the area, particularly to children.

9. It may fairly be anticipated that, unless enjoined, respondent will continue or repeat the acts and conduct set forth in Findings of Fact 4(j) through (n) above, or similar acts and conduct, in violation of Section 8(b) (4) (ii) (D) of the Act. It is therefore essential, appropriate, just and proper, for the purpose of effectuating the policies of the Act, protecting the public interest, and preventing irreparable injury, and in accordance with the provisions of Section 10(l) of the Act, that, pending final disposition of the matters herein which are now before the Board, respondent be enjoined and restrained from the commission of the acts and conduct above set forth, similar acts and conduct, or repetitions thereof.

CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties to, and the subject matter of, this proceeding, and under Section 10 (l) of the Act is empowered to grant injunctive relief.

2. There is, and petitioner has, reasonable cause to believe that:

(a) Respondent is a labor organization within the meaning of Sections 2(5), 8(b) and 10(l) of the Act.

(b) Utility and Bacco are engaged in commerce within the meaning of Section 2(6) and (7) of the Act.

(c) Respondent has engaged in unfair labor practices within the meaning of Section 8(b) (4) (ii) (D) of the Act, affecting commerce within the meaning of Section 2(6) and (7) of the Act, and a continuation of these practices will impair the policies of the Act as set forth in Section 1(b) thereof.

3. To preserve the issues for orderly determination as provided in the Act, to protect the public welfare, and to prevent irreparable injury, it is appropriate, just and proper that, pending final disposition of the matters herein which are before the Board, respondent, its officers, representatives, agents, servants, employees, attorneys and all members and persons acting in concert or participation with it or them, be enjoined and restrained from the commission, continuation, or repetition of the acts and conduct set forth in Findings of Fact 4(j) through (n) above, acts or conduct in furtherance or support thereof, or like or related acts or conduct the commission of which in the future is likely or may fairly be anticipated from respondent's acts and conduct in the past.

## OPINION

On November 3, 1967, Utility filed a charge with the Board against respondent alleging that respondent has engaged in, and is engaging in, acts and conduct in violation of Section 8(b) (4) (ii) (D) of the Act. Essentially, Utility alleges that respondent has attempted, and is attempting, to force it, by means of picketing threats, to reassign certain work at a Stamford, Connecticut, job site to members of respondent union rather than to those men, members of another union, to whom the work has already been assigned by Utility.

 It is not within this Court's competence at this stage of the proceedings to decide whether respondent has committed the unfair labor practices with which it has been charged.[2] This determination must be left to the Board which was scheduled to commence appropriate hearings on November 29, 1967. Rather, the Court must consider the instant petition of the Regional Director in light of whether a preliminary injunction to preserve or restore the status quo during the pendency of the matter before the Board is necessary to prevent irreparable injury and whether the Regional Director has "reasonable cause" to believe that the unfair labor practices charge is true.[3]

Utility's work in Stamford involves an $880,000 contract with HELCO for the installation of underground cable to provide a badly needed increase in the electrical capacity and supply in the Stamford area. Utility performs such cable laying work in various areas, working out of its New Jersey offices. When it secures a contract from an electric utility such as HELCO, Utility sends some of its employees from headquarters to the job site. These men are all members of Local 104, International Brotherhood of Electrical Workers (IBEW), AFL–CIO. Additional men are hired at the site through the IBEW local serving that particular area. In this instance Utility hired men belonging to Local 501 of IBEW, located at White Plains, New York. Under the procedure followed by Utility, its men do not prepare the trench in which the cable and protecting pipe are laid. This task is performed by a subcontractor. At the Stamford project, the subcontractor is Bacco. Bacco's employees are members of respondent union. The subcontractor's men dig the trench and cover its bottom with a layer of sand. Following behind the subcontractor's men as the trench is progressively dug and prepared, Utility's employees, operating a hydro-lift crane, place sections of pipe at the bottom of the trench. Other Utility employees then weld the

2. McLeod v. Local 25, Int'l Bhd. of Elec. Workers, supra note 1, at 638; Schauffler v. Local 1291, Int'l Longshoremen's Ass'n, 292 F.2d 182, 187–188 (3 Cir. 1961); Douds v. Milk Drivers & Dairy Employees Union, 248 F.2d 534 (2 Cir. 1957).

3. McLeod v. Local 25, Int'l Bhd. of Elec. Workers, supra note 1, at 638–639.

sections together. As the welding is completed the subcontractor backfills the trench. Only after the pipe has been installed and the trench covered is the cable actually pulled through the pipe by Utility's men operating vacuum pumps and a cable pulling winch. It is obvious that Utility's men must work in close cooperation with the subcontractor's men for the operation to proceed smoothly.

Work commenced in Stamford on or about October 18, 1967 but was effectively halted by October 25, because of the dispute between respondent and Utility initially over who should operate the hydro-lift crane and subsequently over who should start and stop the welding machine and operate the vacuum pumps and cable pulling winch.

■■ The fact that the actual work stoppage was ordered by Utility does not excuse respondent. It is not premature for the Board to seek an injunction absent actual picketing and a refusal of employees to cross the picket line and work when, as here, the facts clearly show that the respondent union's actions justified the employer in calling a work halt. Utility's actions were obviously motivated not only by a reasonable belief that a picket line was about to be set up which would not be crossed by Bacco's men but also by a fear that trouble of a more serious nature would occur at the job site between the two groups of employees. The point here is that the work stoppage was not a gratuitous act of the employer but was as much a result of the respondent union's actions as it would have been if picketing had actually commenced. Under such circumstances an injunction may be just as necessary to restore the status quo and prevent irreparable injury. At the least an injunction may be necessary to stabilize the situation.[4]

The seriousness of a complete work halt in this project so important to the public welfare of the whole Stamford area is clear enough. But what made the situation particularly intolerable was the fact that at the time of the stoppage 600 to 700 feet of trench remained open and unfilled, inconveniencing adjacent property owners and endangering the lives of children attending a nearby school. Realizing that these conditions could not continue, Utility decided to attempt to call the men back to work and to institute a system whereby Bacco's men and Utility's men would alternate their work at the job site so that the two groups would never confront each other. This was done and that procedure is currently being followed. Although the work is thus now continuing, there is no question but that such procedure is entirely unsatisfactory. First, Mr. Dill, Utility's construction manager at the site, testified that between the beginning of the work stoppage and the present, about three weeks of good working weather have been lost. Furthermore, Mr. Dill testified that if this procedure of alternating the work crews at the site is continued the time needed for completion of the cable laying will be doubled. A delay of even a much shorter period would have a considerably detrimental effect on all concerned, including the public, in light of the originally scheduled completion date of September, 1968, and the known need for expanded electrical capacity in the rapidly growing southern Connecticut area. Still another objection to the present work procedure is the additional time during which the trench remains open, thus constituting a hazard to the residents and children of the area. Normally, with Utility and Bacco working side by side, as soon as a small section of trench is opened, pipe is placed in it and welded and that section of trench is immediately refilled. It is evident that with only one of the two crews at the site at any given time this cannot be done.

For these reasons it is clear that it is "just and proper" for an injunction to issue if petitioner has reasonable cause to believe respondent has engaged in unfair labor practices within the mean-

4. Id. at 639.

ing of Section 8(b) (4) (ii) (D) of the Act. Unless work on this project proceeds smoothly and without interruption until the Board can decide the dispute between respondent and Utility, irreparable injury will occur. An injunction will restore the status quo and stabilize the situation and thereby permit an efficient operation at the Stamford job site. The Court is fully aware of the possible adverse effect that an injunction may have on respondent. Nevertheless, the countervailing factors force the Court to conclude that on general equitable principles an injunction is necessary and appropriate here.

There still remains the question of whether petitioner has reasonable cause to believe that the unfair labor charge is true.[5] Little comment is necessary here. Utility has charged respondent with violation of Section 8(b) (4) (ii) (D) of the Act which reads as follows:

"8(b) It shall be an unfair labor practice for a labor organization or its agents—

(4) (ii) to threaten, coerce or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is:

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work."

It is agreed that respondent is a labor organization and that Utility and Bacco are engaged in commerce or in an industry affecting commerce, within the meaning of the Act. Respondent does not contend that Utility is failing to conform to an order or certification of the Board determining the bargaining representative for employees operating the hydro-lift crane, the start and stop button on the welding machine, the vacuum pumps, or the cable pulling winch. Furthermore, respondent's representatives testified that they have indeed sought reassignment of the operation of the equipment in question by Utility to their members. Most importantly, a business agent of respondent admitted that he made reference to picketing signs at an October 24 meeting with a representative of Utility during which respondent's demands for reassignment were pressed. The business agent also admitted that he actually held up a wrapped package of picket signs at a similar meeting on October 31.

Actual picketing is unnecessary to establish a violation of Section 8 (b) (4) (ii) (D); threats of picketing are enough if they are made for the purpose of forcing the reassignment of work.[6] But respondent's basic claim is that any references to picketing which may have been made were to lawful informational picketing for the purpose of protesting the employment of out-of-state workers by Utility rather than for the purpose of forcing a work reassignment. Such a contention is properly for the Board to determine.[7] For present purposes it is clear that the admitted references to picket signs made in the context of the assignment dispute is more than enough to find that petitioner has reasonable cause to believe the Act has been violated.[8] As counsel for respondent candidly admits, under the present

---

5. See McLeod v. Local 25, Int'l Bhd. of Elec. Workers, supra note 1.

6. See N.L.R.B. v. Local 294, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Amer., 342 F.2d 18 (2 Cir. 1965) ; N.L.R.B. v. District Council of Painters No. 48, 340 F.2d 107 (9 Cir. 1965), cert. denied, 381 U.S. 914 (1965).

7. McLeod v. Local 25, Int'l Bhd. of Elec. Workers, supra note 1, at 640.

8. See Modern v. Building Trades Council of New Haven, 48 L.C. ¶ 18,733 (D. Conn.1964).

state of the law the fact that picketing threats may have had a lawful purpose in addition to the unlawful one does not relieve the Court of the obligation to implement the Act to prevent such threats.[9] Even if respondent's agent had not admitted making the references to picketing signs, there was ample testimony by Utility and Bacco representatives concerning picketing threats to lead the Court to the same conclusion. The fact that this testimony is disputed by respondent is only pertinent here to the extent that it has bearing on petitioner's basis for believing that the Act has been violated. Since it is for the Board rather than the Court to decide ultimate questions of credibility,[10] it is sufficient to state at this time that such testimony even without the admissions of respondent's agent provides an ample basis for a finding that there is "reasonable cause" to believe that the elements of unfair labor practices are present.

Thus, the Court finds that petitioner has reasonable grounds to believe that the charge made by Utility against respondent of unfair labor practices in violation of Section 8(b) (ii) (4) (D) of the Act is true and that an injunction is just and proper to effectuate the policies of the Act, to protect the public welfare, and to prevent irreparable injury.

■ Respondent requests that if the Court does issue an injunction it should not do so in the broad language usually suggested in such cases but should make specific provision to permit respondent to carry on informational picketing to protest the employment by Utility of out-of-state workers. The language suggested by petitioner and here adopted by the Court, however, only prohibits acts which constitute unfair labor practices.[11]

Respondent also requests that in case an injunction is issued it should apply only to threats of picketing against Utility or Bacco and should not include threats of picketing against "any other person engaged in commerce." However, no matter against whom the threats are directed, the subsequent words of the injunction make it clear that such threats are enjoined only if they are aimed at forcing Utility to reassign the operation of the equipment in question to members of respondent union. The injunction is thus properly limited in scope.

Therefore the instant petition for a preliminary injunction pending determination of the unfair labor practices charge by the Board is granted.

## ORDER

ORDERED that, pending final disposition of the matters involved which are before the National Labor Relations Board, respondent Local 478, International Union of Operating Engineers, AFL–CIO, its officers, representatives, agents, servants, employees, attorneys, and all members and persons acting in concert or participation with it or them,

9. See, e.g., N.L.R.B. v. Local 683, Int'l Bhd. of Elec. Workers, 359 F.2d 385 (6 Cir. 1966).

10. McLeod v. Local 25, Int'l Bhd. of Elec. Workers, supra note 1; Schauffler v. Local 1291, Int'l Longshoremen's Assn., 292 F.2d 182, 188 (3 Cir. 1961); Greene v. Mr. Wicke Ltd. Co., 270 F.Supp. 1012 (D.Conn.1967); Modern v. Building Trades Council of New Haven, supra note 8.

11. Contrast the wording of the injunction in McLeod v. Chefs, Cooks, Pastry Cooks and Assistants, Local 89, 181 F.Supp. 742 (S.D.N.Y.1960), which simply prohibited "all picketing" of the employer and was, therefore, disapproved at 280 F.2d 760 (2 Cir. 1960). Although in Green v. International Typographical Union, 182 F.Supp. 788 (D.Conn.1960), then District, now Circuit, Judge Anderson issued an injunction expressly excepting picketing permitted under the second proviso of Section 8(b) (7) (C) of the Act, it is unnecessary to do so here where the wording of the injunction is specifically limited to prohibited acts. See Green v. International Typographical Union, 186 F.Supp. 630 (D. Conn.1960), for a contempt proceeding arising out of the above injunction.

be, and they hereby are, enjoined and restrained from:

(a) Threatening to picket or picketing Utility Service Corporation or any other person engaged in commerce or in an industry affecting commerce where in any case an object thereof is to force or require Utility Service Corporation to assign the work of operating the hydro-lift, the start and stop button on the welding machine, the cable pulling winch and the vacuum pumps to employees who are members of, or represented by, respondent rather than to employees who are members of, or represented by, Local 501, International Brotherhood of Electrical Workers, AFL–CIO, or who are not members of, or represented by, respondent.

(b) In any like or related manner, or by any means, threatening, coercing, or restraining Utility Service Corporation, or any other person engaged in commerce or in an industry affecting commerce, for an object set forth in subparagraph (a) hereof.