Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on Behalf of the **NATIONAL LABOR RELATIONS BOARD**, Petitioner,

v.

**NATIONAL MARITIME UNION OF AMERICA, AFL–CIO,**
and

Seafarers' International Union of North America and its Affiliates, including the Sailors' Union of the Pacific, Respondents.

Nos. 71 Civ. 3494, 3590.

United States District Court,
S. D. New York.

Oct. 12, 1971.

Bertram T. Kupsinel, N.L.R.B., Second Region, New York City, for petitioner.

Schulman, Abarbanel, Perkel & McEvoy, New York City, for Seafarers' International Union of North America and its Affiliates, including the Sailors' Union of the Pacific; Howard Schulman, New York City, of counsel.

Abraham E. Freedman, Stanley B. Gruber, New York City, of counsel, for National Maritime Union of America, AFL–CIO.

Simpson, Thacher & Bartlett, Edward L. Coffey, John W. Ohlweiler, Martin Zuckerman, New York City, of counsel, for Prudential-Grace Lines, Inc.

H. Clayton Cook, Jr., Gen. Counsel, Paul Hardy, Asst. Gen. Counsel, of counsel, U. S. Dept. of Commerce Maritime Administration, Washington, D. C., amicus curiae.

PIERCE, District Judge.

This cause came on to be heard upon the verified petitions of Ivan C. McLeod, Regional Director of the Second Region of the National Labor Relations Board

(hereinafter the Board), for a temporary injunction pursuant to Section 10 (*l*) of the National Labor Relations Act (hereinafter the Act), as amended, pending the final disposition of this matter before the Board, and upon the issuance of an order to show cause why injunctive relief should not be granted as prayed in said petitions.

A hearing on the issues raised by the petitions was held on August 31, September 1, 2, 3, and 8, 1971. All parties were afforded full opportunity to be heard, to examine and cross-examine witnesses, to present evidence bearing on the issues, and to argue on the evidence and the law. The Court has fully considered the petitions, evidence, arguments and briefs of counsel. Upon the entire record, the Court makes the following:

## I. FINDINGS OF FACT

1. Petitioner is Regional Director of the Second Region of the National Labor Relations Board, an agency of the United States, and filed the petitions for and on behalf of the Board.

2. Jurisdiction of this Court is invoked pursuant to section 10(*l*) of the National Labor Relations Act, 29 U.S.C. section 160(*l*) (1970), as amended.

3. On June 23, 1971, Prudential-Grace Lines, Inc. (herein at times called "the Company") pursuant to the provisions of the Act, filed charged with the Board, alleging that each of the labor organizations named above as respondents has engaged in, and is engaging in, unfair labor practices within the meaning of section 8(b) (4) (i) (D) or section 8(b) (4) (ii) (D) of the Act.

4. The aforesaid charges were referred to petitioner as Regional Director of the Second Region of the Board.

5. The petitioner, after investigation of the aforesaid charges, alleged that he had reasonable cause to believe that respondents Seafarers International Union of North America (hereinafter "SIU") and Sailors Union of the Pacific (herein-after "SUP") violated section 8(b) (4) (ii) (D) of the Act.

6. The petitioner, after investigation of the aforesaid charges alleged that he had reasonable cause to believe that the respondent National Maritime Union of America, AFL–CIO (hereinafter "NMU"), violated section 8(b) (4) (i) (ii) (D) of the Act.

7. Each respondent is an unincorporated association, an organization in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment or conditions of work.

8. Respondent SIU is a labor organization within the meaning of the Act and maintains its principal place of business at 675 Fourth Avenue, Brooklyn, New York, and transacts business within the territorial jurisdiction of this Court.

9. The respondent SIU consists of several districts, one of which is the Pacific District which comprises the SUP, the Marine Firemen's Union and the Marine Cooks and Stewards Union.

10. Respondent SUP is a labor organization within the meaning of the Act and maintains its principal place of business at 450 Harrison Street, San Francisco, California, and transacts business within the territorial jurisdiction of this Court.

11. Respondent NMU maintains its office at 36 Seventh Avenue, New York, New York, and respondent at all times material herein has been engaged within this judicial district in transacting business and in promoting the interests of its employee members.

12. The Company, a Delaware corporation, with its principal office located at One New York Plaza, New York, New York, is engaged in the business of transporting goods in interstate and foreign commerce. During the past year, it derived in excess of $50,000,000 gross revenue from its operations.

13. From in or about 1938 until in or about December, 1969, Prudential Steamship Company, Inc., formerly known as Prudential Lines, Inc. and Prudential Steamship Corporation, was engaged as an oceangoing carrier in the shipping industry on various trade routes operated from the East Coast of the United States, and its unlicensed personnel were represented by respondent NMU.

14. Since in or about 1938, Prudential-Grace Lines, Inc., formerly known as Grace Line Inc., and since December, 1969, a subsidiary of Prudential Steamship Company, Inc., has been engaged as an oceangoing carrier in the shipping industry, in the business of transporting goods in interstate and foreign commerce, and at all times material herein the Company has had an operating subsidy contract with the government of the United States which covered two fleets; one fleet based on and operating from the East Coast, whose unlicensed personnel have been represented by respondent NMU and the other fleet based on and operating from the West Coast, whose unlicensed personnel have been represented by respondent SIU (Pacific District) unions.

15. In or about February or March, 1971, the Company decided for economic reasons to transfer two ships, the Seajet and the Oceanjet, from service based on the East Coast to the West Coast for operations on a trade route or trade routes to be serviced from the West Coast.

16. On or about April 7, 1971, the Company, by Spyros S. Skouras, Jr., its President, notified respondent NMU's President, Joseph Curran, of the contemplated transfer.

17. Since on or about April 7, 1971, respondent, NMU by its President Joseph Curran, has demanded that if the Seajet and the Oceanjet were transferred from the East Coast to the West Coast they would have to continue to be operated by employees represented by respondent NMU under respondent NMU's collective bargaining agreement with the Company.

18. Each of the two jet ships is manned by a complement of twenty-six unlicensed seamen.

19. The collective bargaining agreement referred to above in paragraph 17 between the Company and respondent NMU contains provisions, *inter alia*, which require that the manning of all ships operated by the Company be done through respondent NMU's hiring hall.

20. In or about the month of April, 1971, the Company informed respondent SUP that respondent NMU had demanded that once the ships were transferred to the West Coast the Company retain in employment on the Seajet and Oceanjet the employees then employed thereon and continue thereafter to apply NMU's collective bargaining contract to the ships' operations.

21. Since in or about April, 1971, respondent SUP, by Morris Weissberger, who is Secretary-Treasurer of SUP and a Vice-President of SIU, has asserted that the Seajet and the Oceanjet, upon transfer to the West Coast would have to be operated by employees represented by respondent SUP under the existing collective bargaining agreement with the Company.

22. The collective bargaining agreements referred to above in paragraph 21 between the Company and respondent SIU (Pacific District) unions contain provisions, *inter alia*, which require that the unlicensed Deck Department personnel of all ships operated by the Company and based on the West Coast be done through respondent SUP's hiring hall.

23. On or about April 24 and May 14, 1971, the Company has laid up the Seajet and the Oceanjet, which it had contemplated transferring to the West Coast, at a cost of $8,000 per day, because of the demand by respondent NMU described above in paragraph 17.

24. On or about June 1, 1971, respondent NMU by Mel Barisic, its Vice-President, and on or about June 16 and 18, 1971, respondent NMU by its president, Joseph Curran, stated that the Seajet and the Oceanjet would not be man-

ned for voyages to the West Coast and could not be moved unless the Company agreed that they would thereafter be continued to be manned by employees represented by respondent NMU and that the collective bargaining agreement between the Company and respondent NMU would be applied to them.

25. An NMU member cannot reship aboard his vessel unless he registers to do so.

26. An NMU member who collects severance pay as a result of his ship having been laid up for over ninety days is not eligible to reship on the vessel once it resumes service.

27. Since in or about June, 1971, because of the conduct of respondent NMU described above the Company has been unable to effectuate the transfer of the two jet ships to the West Coast.

28. Since June, 1971 respondent NMU has refused to perform services, and has thereby restrained the Company from transferring the jet ships.

29. An object of respondent NMU's acts and conduct set forth above has been, and is, to force and require the Company to assign particular work to employees who are members of, or represented by, respondent NMU, rather than to employees who are members of or represented by respondent SIU and its affiliates, including SUP.

30. As a result of the NMU's refusal to man the jet ships the foreign and domestic commerce of the United States is adversely affected.

31. It may fairly be anticipated that, unless enjoined, respondent NMU will continue or repeat the acts and conduct set forth above, or similar or like acts and conduct.

## II. DISCUSSION

### A. *The Role of the Court*

Congress intended that § 10 (*l*) [1] serve as a means to preserve the status quo in a labor dispute pending final determination by the Labor Board.[2] The Court's role is therefore a restricted one. It must measure the testimony against the law of section 8(b) (4) (i) (ii) (D) [3] [hereinafter "8(b) (4) (D)"]

1. Labor-Management Relations Act § 10 (*l*), 29 U.S.C. § 160(*l*) (1970), provides that:

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (A), (B), or (C) of section 158 (b) of this title, or section 158(e) of this title or section 158(b) (7) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court

shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law * * *. In situations where such relief is appropriate the procedure specified herein shall apply to charges with respect to section 158(b) (4) (D) of this title.

2. McLeod v. Local 25, IBEW, 344 F.2d 634, 638 (2d Cir. 1965); Schauffler v. Local 1291, ILA, 292 F.2d 182, 188 (3rd Cir. 1961); Douds v. ILA, 242 F.2d 808, 811 (2d Cir. 1957); McLeod v. Int'l. Union of Operating Engineers Local 478, 278 F.Supp. 22, 27, 29 (D.Conn.1967); McLeod v. Newspaper & Mail Deliverer's Union, 209 F.Supp. 434, 438 (S.D.N.Y. 1962).

3. Labor-Management Relations Act § 8(b) (4) (i) (ii) (D), 29 U.S.C. § 158(b) (4) (i) (ii) (D) (1970) provides:
§ 8(b) It shall be an unfair labor practice for a labor organization or its agents—
 * * * * *
(4) (i) to engage in, or to induce or encourage any individual employed by any person * * * to engage in, a

to determine "whether the [Regional] Director could have 'reasonable cause to believe' that the charges filed were true."[4] In different form this test has been set forth variously as inquiring whether the record supports a likelihood of finding a violation[5] or whether the charges are essentially "insubstantial and frivolous"[6] or whether there is a "reasonable possibility" that the unfair practice charge will be sustained.[7] This Court does not bear the responsibility of determining the ultimate truth of the facts alleged in the Regional Director's petition;[8] it is the Board which must make the final determination of the credibility of witnesses and resolve conflicts in the testimony.[9] This Court does not serve as the "primary interpreter of the statutory scheme." Here again, the burden is borne by the Board and reviewing courts.[10] Furthermore, the fact that the Regional Director may rely on an untested or unsettled theory of the law does not, of itself, require denial of the petition; the absence of prior decisions directly on point does not mandate the conclusion that the Director cannot comply with the standard of reasonable cause to believe.[11] In sum, then, the requested injunctive relief may issue if the credible evidence offered establishes a prima facie case.[12]

strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person * * *, where in either case an object thereof is—

* * * * *

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work.

4. Douds v. Milk Drivers & Dairy Employees Union Local 584, 248 F.2d 534, 537 (2d Cir. 1957). *See* McLeod v. Local 25, IBEW, 344 F.2d 634, 638 (2d Cir. 1965); McLeod v. Business Machine and Office Appliances Mechanics Conference Board, Local 459 Int'l. Union of Elec. Workers Local 459, 300 F.2d 237, 241 (2d Cir. 1962).

5. Douds v. Milk Drivers & Dairy Employees Union Local 584, 248 F.2d 534, 537 (2d Cir. 1957).

6. San Francisco-Oakland Newspaper Guild v. Kennedy, 412 F.2d 541, 544 (9th Cir. 1969); Schauffler v. Local 1291, ILA, 292 F.2d 182, 187 (3rd Cir. 1961); Samoff v. Local 542–A, –B, –C, Int'l. Union of Operating Engineers, 238 F. Supp. 376, 380–382 (M.D.Pa.1964); Schauffler v. Local 677, UAW, 201 F. Supp. 637, 638 (E.D.Pa.1961).

7. McLeod v. Local 25, IBEW, 344 F.2d 634, 638 (2d Cir. 1965); McLeod v. Business Machine and Office Appliance Mechanics Conference Board, Local 459 Int'l. Union of Elec. Workers, 300 F.2d 237, 241 (2d Cir. 1962).

8. McLeod v. Local 25, IBEW, 344 F.2d 634, 638 (2d Cir. 1965); Schauffler v. Local 1291, ILA, 292 F.2d 182, 187–88 (3rd Cir. 1961); Douds v. Milk Drivers & Dairy Employees Union Local 584, 248 F.2d 534, 537 (2d Cir. 1957); McLeod v. Int'l. Union of Operating Engineers Local 478, 278 F.Supp. 22, 27 (D.Conn.1967).

9. McLeod v. Local 25, IBEW, 344 F.2d 634, 638 (2d Cir. 1965); McLeod v. Int'l. Union of Operating Engineers Local 478, 278 F.Supp. 22, 30 (D.Conn.1967); McLeod v. Teamsters Local 202, 52 L.C. ¶ 16,512, at 23,107 (S.D.N.Y.1965).

10. McLeod v. Local 25, IBEW, 344 F. 2d 634, 638 (2d Cir. 1965); Schauffler v. Local 1291, ILA, 292 F.2d 182, 188 (3rd Cir. 1961); Schauffler v. Local 677, UAW, 201 F.Supp. 637, 638 (E.D. Pa.1961).

11. Kennedy v. Los Angeles Typographical Union Local 174, 418 F.2d 6, 8 (9th Cir. 1969); McLeod v. Int'l. Union of Operating Engineers Local 478, 278 F. Supp. 22, 30 (D.Conn.1967); Samoff v. Local Union No. 542–A, –B, –C, Int'l. Union of Operating Engineers, 238 F. Supp. 376, 381 (M.D.Pa.1964); Schauffler v. Local 677, UAW, 201 F.Supp. 637, 638 (E.D.Pa.1961).

12. McLeod v. Teamsters Local 202, 52 L.C. ¶16,512, at 23,107 (S.D.N.Y.1962); Penello v. Sheet Metal Workers Int'l. Ass'n. Local 59, 195 F.Supp. 458, 472 (D.Del.1961).

A finding of reasonable cause to believe a violation has occurred, however, does not terminate the inquiry. The district court must satisfy itself that issuance of the injunction would be "just and proper" under the circumstances.[13] The Court recognizes that it is therefore under an obligation to consider general equitable principles.[14] But this does not imply that it should ignore its assigned statutory role, that of stabilizing the situation to insure that the flow of interstate commerce is not hampered by proscribed activities during the period between the filing of the petition and final resolution of the matter by the Board.[15]

## B. *Respondent NMU*

In response to the petition, NMU contends that its refusal to man the Seajet and the Oceanjet for voyage to the West Coast is not cognizable as a violation of section 8(b) (4) (D) of the Act. It alleges that it is engaged in a work preservation action and that therefore the instant dispute lies solely between itself and Prudential-Grace. Stated differently, the union contends that where it is at odds with an employer because the latter unilaterally[16] proposes to shift work from its members to those of another union, it may engage in economic action designed to preserve the jobs of its members.[17]

The NMU relies, more specifically, on the recent Board decision in *Waterway Terminals Co.*[18] There the employer terminated its subcontracting arrangement and replaced the subcontractor's employees with its own. Subsequently, the displaced union picketed in an effort to obtain reemployment for the individuals involved. The Board quashed the

13. *See* note 1 *supra.*

14. McLeod v. Local 25, IBEW, 344 F.2d 634, 638 (2d Cir. 1965). *See also* Retail, Wholesale & Department Store Union v. Rains, 266 F.2d 503, 505–506 (5th Cir. 1959).

15. McLeod v. Local 25, IBEW, 344 F. 2d, 634, 639 (2d Cir. 1965); Douds v. Wood, Wire and Metal Lathers Int'l. Ass'n. Local 102, 245 F.2d 223, 225 (3rd Cir. 1957); McLeod v. Int'l. Union of Operating Engineers Local 478, 278 F.Supp. 22 (D.Conn.1967).

16. It is undisputed that the entire plan emanated from the Company.

17. The NMU cites NLRB v. Radio and Television Broadcast Engineers Union Local 1212, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961) (hereinafter *CBS*) and subsequent Board decisions in support of this proposition. In *CBS*, the Court held that the Board must make an affirmative award of work as between the competing unions charged with § 8(b) (4) (D) violations at the § 10(k) hearing (see note 19 *infra*). Safeway Stores, Inc., 134 N.L.R.B. 1320 (1961) was among the first 10(k) proceedings to be decided by the Board after *CBS*. In *Safeway* it reaffirmed its earlier stance (see note 20 *infra*) that only the traditional "jurisdictional dispute", between two competing unions vis-a-vis a neutral employer, was cognizable as a § 8(b) (4) (D) violation, citing *CBS*. Thus it

has consistently held that where a union engages in economic action designed to secure reemployment of employees displaced by a management decision to allocate the work to other employees or in order to obtain a collective bargaining agreement, the union does not violate § 8(b) (4) (D) regardless of whether another union demands the work. Rocky Mountain Bank Note Co., 145 N.L.R.B. 921 (1964); Bulletin Co., 139 N.L.R.B. 1391 (1962); Metal Co., 136 N.L.R.B. 1402 (1962); Hills Transportation Co., 136 N.L.R.B. 1086 (1962); Gordon Broadcasting of San Diego, Inc., 127 N.L.R.B. 1070 (1960). *See also* Mechanical Contractors Ass'n of Cleveland, Inc., 168 N.L.R.B. 997 (1967); Acoustics & Specialties, Inc., 139 N.L.R.B. 598 (1962); Bendix Radio Division, 138 N.L. R.B. 689, 694 (1962).

In Lawrence Erie, Co., 156 N.L.R.B. 1687 (1966), the Board indicated, however, that this rule was not without limitation. It held that the rule did not entitle the aggrieved union to utilize the opportunity presented by the management reallocation to pursue objectives beyond the reemployment of the displacees. See text accompanying notes 24–27 *infra*.

18. 185 N.L.R.B. No. 35 (1970). The NMU also cited Slattery Contracting Co., 156 N.L.R.B. 749 (1966) to support its position. It devoted only brief comment to this case, however, and the discussion of *Waterway Terminals, infra,* suffices to cover the entire point.

10(k) Notice of Hearing[19] declaring that the decisions in *Franklin Broadcasting*[20] and *Safeway Stores*[21] controlled the resolution of the case. In these cases, involving situations similar to that in *Waterway,* the Board held that 8(b) (4) (D) did not empower it to "arbitrate disputes between an employer and a union"[22] The Board did so despite its recognition that this type of dispute seemed to fall within the literal proscription of the statute.[23]

■ The *Waterway* majority carefully distinguished the case before it from *Lawrence Erie Co.*[24] In *Lawrence Erie,* the successor employer had replaced its predecessor's employees, members of the International Longshoremen's Association (ILA), with workers belonging to District 50, its contract union. During the course of negotiations instituted in an attempt to end the ILA picketing, the ILA representatives stated that they were seeking to replace District 50 members with individuals from their own hiring hall. The Board determined that this particular ILA objective brought the picketing within the prohibition of section 8(b) (4) (D)[25] since the action indicated that the ILA claimed jurisdiction over the work involved. In *Waterway* the majority emphasized that the union before it "merely sought employment of the dislocated workers and continued application of the bargaining agreement covering them";[26] it noted that in *Lawrence Erie* the ILA had pursued "interests which were unrelated to the job rights" of the displacees.[27]

The Regional Director here relies on this distinction, contending that the NMU has gone beyond the permissible bounds of the work preservation defense as expounded in *Waterway Terminals.*

■ The Court agrees with petitioner since it does not appear that respondent NMU has acted here with the sole objective of preserving the jobs of its members. This conclusion is based upon the testimony adduced at the hearing. The NMU President testified that "many" members of the jet crews were "standing by in the union hall," prepared to reship when the vessels resume

19. § 10(k) of the Act, 29 U.S.C. § 160(k) (1970) provides:
 Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute.

20. 126 N.L.R.B. 1212 (1960). This case was decided prior to *CBS* and it established the work preservation theory advanced by NMU.

21. 134 N.L.R.B. 1320 (1961). For a brief discussion of this case see note 17 *supra.*

22. 185 N.L.R.B. No. 35, pp. 5-6 (1970).

23. Id. at 5.

24. 156 N.L.R.B. 1687 (1966).

25. If one objective of the union's conduct is found to be prohibited by the Act, that conduct constitutes a violation of the statute regardless of whatever other laudable goals motivated the union action. *See, e. g.,* Cargill Inc., 108 N.L.R.B. 313 (1954).

26. 185 N.L.R.B. No. 35, p. 5 (1970).

27. Id. at 6. A persuasive dissent in *Waterway Terminals* argued that the picketing was not directed solely against the employer's refusal to retain the subcontractor's employees, but also sought recognition as bargaining agent of the present employees performing the work previously subcontracted. Thus, it asserted the case fell within *Lawrence Erie* since the union had not limited its objectives to obtaining reemployment for dislocatees. The dissenters further contended that *Franklin Broadcasting* and *Safeway Stores* were inapposite as only one group of employees had claimed the disputed work in those cases, whereas in *Waterway Terminals* both unions sought the work. They found that the situation in *Waterway Terminals* was typical of those "Congress contemplated when it directed the Board to decide which of the conflicting claims was meritorious."

service.[28] The NMU Vice-President testified that "quite a few guys registered reship" but stated that he did not know the exact number.[29] He further stated that a seaman cannot reship unless he "registers" to do so.[30]

Other testimony by the Vice-President revealed that when a ship has been laid-up for over ninety days the NMU Pension and Welfare Fund is authorized to disburse severance pay to the unlicensed personnel of that ship (Tr. 589). He declared that prior to such disbursement the Fund must receive notice from the company confirming lay-up for more than 90 days (Tr. 587–89). In the instant situation, he added, the Fund had been so notified. (See Pet. Exh. 16A and 16B.) He continued to state that if a seaman collects severance pay he is no longer permitted to reship aboard the laid-up vessel once it resumes service (Tr. 589).

In *Waterway Terminals* the Board upheld the union's claim of a valid work preservation defense because it found the union's actions were aimed solely at obtaining "continued employment of

---

28. The witness testified, upon examination by the Court:

 When they were laid up they were not told they were going to be transferred and they got reship cards so there are *many of them* standing by in the union hall thinking they are going to be reshipped on those ships because they were never advised that they were going to be transferred.

 They were advised that they were being laid up. We have a policy on laid-up vessels in the event that they come out within a period of time. I forget the exact period of time, the former crew is entitled to ship back aboard.

 If it goes beyond a certain number of days, I am not sure, I think it's 90 days. After 90 days they have to ship off the open quarter. (Emphasis added).

 Tr. 412. To some extent, this contradicts his immediately preceding statement:

 THE COURT: If they went to the West Coast with NMU personnel and were to be manned on the West Coast with NMU personnel, would the last people to hold those jobs here on the East Coast be offered those jobs by the union on the West Coast, if they went to the West Coast?
 THE WITNESS: By NMU?
 THE COURT: Yes.
 THE WITNESS: They would keep their jobs.
 THE COURT: They are considered to still have them?
 THE WITNESS: Yes.
 THE COURT: They would have the opportunity, if they chose, to remain on these ships though they were on the West Coast?
 THE WITNESS: They can remain in the employ of the company as long as their services are mutually satisfactory.

 THE COURT: And on those ships?
 THE WITNESS: Yes.
 Tr. 411. It is to be noted that the witness did not depart from his statement that "many" seamen were awaiting to reship.

29. He testified as follows:
 Q. You say that the members of the crews of these two ships did sign to reregister for these two ships?
 A. Yes, sir.
 Q. How do you know that?
 A. Well, through our business in port of Baltimore.
 Q. He telephoned you?
 A. I asked him personally if the guys is registered, yes, and also I asked some guys coming to my office asked me when the ships come out.
 Q. There are how many men on each of these ships when they are in operation?
 A. 26.
 Q. Unlicensed seamen?
 A. Unlicensed seamen.
 Q. Did he tell you how many of the 26 on each of these ships had registered to go back on the ships?
 A. He didn't give me the exact number but he said quite a few guys registered reships and if I know anything later on, he said, if I know anything, when the ships coming out.
 Q. So you don't know how many men actually reregistered to go on board?
 A. No, not the exact figure, no, sir.
 Tr. 578–79.

30. Tr. 570–90. See also Rule 28(b) of the NMU Shipping Rules (Pet. Exh. 5) and Section 53, paragraph G of the NMU collective bargaining agreement (Pet. Exh. 4), although the precise relationship of these documents to the witness' testimony was not clearly established. Tr. 589–97.

*those presently working."* (Emphasis added).[31]

The NMU persistently maintained that, consistent with *Waterway*, it is seeking to preserve the jobs of only the fifty-two former crew members of the two jet ships.[32] The above testimony fails to adequately support this contention. The union President's statement that "many" of the former jet crew members were "standing by" to reship, and the Vice-President's testimony that he thought "quite a few guys" were in that position, standing alone, suggest that not all fifty-two seamen are prepared to reship and that therefore NMU does not seek to preserve jobs for only persons who are former jet crew members. Moreover, the record fails to show that the fifty-two former jet crew members are able to comply with union reshipping rules:[33] the NMU made no showing that *all* the unlicensed personnel had registered to reship;[34] further, it did not establish that *none* of the crew members had collected available severance pay. Indeed, the very use of the terms "many" and "quite a few" by the union officials underscores the failure of the union to meet this burden.

In sum, then, the NMU has not demonstrated to the satisfaction of this Court that its refusal to man the ships falls within the confines of the work preservation defense set out in *Water-*

*way.* NMU claims all fifty-two jobs aboard the jet ships, but it has not shown that all of the former crew members are eligible to reship pursuant to union work rules; to the extent any of the personnel cannot reship, NMU is asserting jurisdiction[35] over the jobs involved, rather than preserving "employment of those presently working." The Regional Director is therefore found to have reasonable cause to believe NMU committed a violation of section 8(b) (4) (D).

The NMU argues, alternatively, that in the event the Court decides that its objectives are not sufficiently circumscribed to fall within the meaning of *Waterway*, its actions nevertheless do not constitute violations of section 8(b) (4) (D). It asserts that although "it may be argued that the union's motives went beyond the protection of the crews to the preservation of job opportunities for seamen registered in the NMU Deep-Sea Hiring Hall * * * there is nothing improper in such an objective."[36] the NMU cites two recent opinions issued in section 8(e)[37] proceedings to substantiate this contention.[38] Its position is founded upon the dynamics of hiring hall operation which requires that all jobs held by its members be "fungible": all hiring is done through a central hall; job opportunity and security depend on the number of positions offered through the hall; and the pension

---

31. 185 N.L.R.B. No. 35, p. 5 (1970).

32. Tr. 19–20, 684–87. At one point counsel for respondent NMU said:
 Your Honor, it's our position, and our defense has been, that our refusal to move those ships was tied in to our desire to protect the jobs for the men who were on the ships.

33. See text accompanying note 29 *supra.*

34. As a further indication of the weakness of the NMU's proof on this matter, aside from the Vice-President's statements in note 28 *supra*, the Court observes that the Union President's testimony, set out at note 27 *supra*, is contradictory within itself.

35. Upon cross-examination the union President testified as follows:

Q. You claim jurisdiction over the jobs on the two Jet ships to be transferred to the West Coast?
A. What was that?
Q. Do you claim jurisdiction over the jobs on the ships to be transferred to the West Coast?
A. We claim jurisdiction over all Prudential ships and the Jets have been Prudential ships since they were built.

36. Brief for Respondent NMU at 24.

37. 29 U.S.C. § 158(e) (1970).

38. It cites the trial examiner's decision in the case of NMU; Commerce Tankers Corp., and Vantage Steamship Corp., Case No. 2–CE–44 and the district court opinion issued in the related 10(*l*) proceeding, McLeod v. NMU and Commerce Tankers Corp., 71 Civ. 2300 (S.D.N.Y. 1971).

plan and seniority system are keyed to an industry-wide hiring hall procedure.

■ ■ As noted above, the Board stated in *Waterway* that the union "merely" sought work for the dislocatees and continued application of the existing collective bargaining agreement covering them. The NMU's announced design under this alternative argument is to protect the interests of all of its members and the feasibility of its hiring hall operation. This Court cannot accept the NMU position. To reiterate, it is the Board and reviewing courts which are responsible for interpreting the statute and expanding present theories of application. The ·district court is not empowered in a 10(*l*) proceeding to graft a newly promulgated theory of work preservation from one statutory section [section 8(e)] onto another [section 8(b) (4) (D)] in the face of such an explicit statement of the law as found in *Waterway*.

■ Before an injunction may issue the Court must determine whether the requested injunctive relief is "just and proper" in the circumstances. The NMU notes that the Board may ultimately reach any of three possible dispositions in this case: (a) it may quash the 10 (k) Notice of Hearing; (b) it may award the work to NMU; or (c) it may award the work to SIU. The NMU suggests that if the injunction is granted and either (a) or (b) eventuates, its members will have suffered the loss of irretrievable wages and pension credits. The union also claims the loss of its primary targets for permissible economic action, the ships, will be irreparable under either of these possible Board rulings.

The President of Prudential-Grace, on the other hand, testified that the Company suffers an $8,000 loss for each day the jet ships are laid up.

In general equity terms, the extraordinary financial loss sustained by the Company each day the union action continues outweighs the unspecified amount of lost NMU wages and pension fund contributions. The Court also observes it is unlikely that before the Board rules the Company will capitulate to NMU in·the face of SIU opposition; therefore NMU members will not suffer any additional pecuniary loss under an injunction. If the Board quashes the Notice of Hearing, moreover, the NMU is certainly not bereft of all means of redress.

Furthermore, the Court is not unmindful of its statutory function.[39] Congress intended that section 8(b) (4) (D) serve to free employers from the crippling impact caused by a union's actions in support of its claim for particular work against another union. The petitions herein assert that the relief requested will implement this statutory policy, at least until the Board can act with finality in this matter. The Court agrees with the Regional Director and therefore deems issuance of an injunction against NMU appropriate at this time.

### C. *Respondent SIU and SUP*

Petitioner alleges that he has reasonable cause to believe respondents SIU and SUP have violated the Act. He predicates his position on two conclusions. First, he contends that respondents threatened the company in an effort to obtain a favorable work assignment. He cites a "demand" by SUP Secretary-Treasurer and a statement by the SIU President to substantiate this claim. The Regional Director further argues that SIU is not the certified representative of the Company's West Coast based unlicensed seamen, and therefore is not afforded protection by the proviso in 8(b) (4) (D). He points out that in 1955 the SIU was certified to an association-wide bargaining unit. (Pet. Exh. 2). The subsequent 1965 Clarification (Pet. Exh. 3) also describes the appropriate unit as association-wide. Petitioner argues that since Prudential-Grace withdrew from the association in 1969, and was therefore no longer a member of the multi-employer unit at the

---

39. See text accompanying note 2 *supra*.

time the alleged threats occurred but constituted an independent single employer bargaining unit,[40] the SIU certification cannot be deemed to be applicable.[41]

Respondents SIU and SUP rejoin that the statements of the SIU and SUP officers involved did not constitute threats; that, in any event, alleged threats by the President of the SIU could not be attributed to the SUP, the actual operating union; and that since SIU is the certified bargaining representative of Prudential-Grace employees working on West Coast based vessels, its coercive acts cannot be enjoined as violations because of the 8(b) (4) (D) proviso.

Discussion of this last point alone suffices to dispose of the petition as to these respondents.

 A reading of the certificate, as clarified, reveals that the SIU is the certified representative of all employees working for "members" of an employers' group known as the Pacific Maritime Association. In other words, the unit work is that performed by unlicensed seamen aboard vessels based on the West Coast which are operated by "members." The Regional Director apparently maintains that since the certificate does not specifically describe SIU as bargaining representative for the employees, of what he claims constitutes a single employer bargaining unit, the proviso is inoperative.

 The Court rejects the Regional Director's argument that the certification of the union here was nullified by virtue of the technical change in the posture of the Company and rejects his conclusion that consequently the section 8(b) (4) (D) proviso is not applicable. No cases have been brought to the Court's attention which hold that such a circumstance, standing alone, devitalizes an outstanding certification.[42] The Court notes that certification has been held effective, at least on an impermanent basis, in the face of such compelling claims as where the certified union has lost its majority status [43] or where the interests of various unit members no longer coincide.[44] Indeed, the decisions read adhere to the proposition that certification "must be respected by the employer until changed conditions are reflected by a later ruling of the Board." [45] The Court has not discovered any hint of a willingness to deviate from this entrenched concept. Furthermore, the Court finds petitioner has failed to demonstrate that the circumstances in the

---

40. In light of the SIU's allegation that it never consented to Prudential-Grace's withdrawal (Tr. 722–23), the efficacy of that withdrawal was not clearly established. For cases where withdrawal has not been upheld see, e. g., Kroger Co., 148 N.L.R.B. 569 (1964) ; Robbins & Robbins, Inc., 1962 CCH NLRB ¶ 11,922, Case No. 2–RM–1216. The Court finds it unnecessary to discuss the merits of this issue, however.

41. The Regional Director does not contend that the change of name procedure, whereby Grace Lines, Inc. became Prudential-Grace Lines, Inc. (see Pet. Exh. 14), in any fashion affected the validity of the SIU certification.

42. The Regional Director has not substantiated his position by reference to any case law. See Petitioner's Brief and Memorandum of Points and Authorities.

43. Brooks v. NLRB, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954).

44. An employer must bargain with a certified union for a "reasonable period", even if changes in the unit render that unit inappropriate unless the Board rescinds the certificate. See, e. g., NLRB v. Rex Co., 243 F.2d 356, 360 (3rd Cir. 1957) ; NLRB v. Prudential Ins. Co., 154 F.2d 385, 389 (6th Cir. 1946).

45. NLRB v. Sanson Hoisery Mills, Inc., 195 F.2d 350, 352 (5th Cir. 1952) ; NLRB v. Florida Citrus Canners Cooperative, 288 F.2d 630, 639 (5th Cir. 1961). See also Brooks v. NLRB, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954) ; Tungsten Mining Corp., 106 NLRB 903, 905 (1953). The Court acknowledges that these cases arose in a the instant case ; nevertheless, it finds the statutory context different from that of general background they establish concerning the import of Board certification to be persuasive.

**47**

instant case are sufficiently novel [46] to predict that the Board will depart from this position.

While the Regional Director's theory may, in fact, anticipate accurately the Board's ultimate resolution of the certification issue, he has not sustained his burden before this Court of showing he had reasonable cause to believe that SIU and SUP had committed a violation of the statute. Therefore, the application for injunctive relief against SIU and SUP must be denied.

### III. CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter of this proceeding, and under section 10(*l*) of the Act is empowered to grant injunctive relief.

2. There is, and petitioner has, reasonable cause to believe:

 a. Each respondent is a labor organization within the meaning of Section 2(5), 8(b), and 10(*l*) of the Act.

 b. The Company is engaged in commerce within the meaning of section 2(6) and (7) of the Act.

 c. Respondent NMU has engaged in unfair labor practices within the meaning of section 8(b) (4) (i) (ii) (D) of the Act, affecting commerce within the meaning of section 2(6) and (7) of the Act by refusing to man the Seajet and the Oceanjet and by coercing and restraining the Company and a continuation of these practices will impair the policies of the Act as set forth in section 1(b) thereof.

3. To preserve the issues for their orderly determination as provided in the Act, and thereby effectuate the policies of the Act, it is appropriate, just and proper, in accordance with section 10 (*l*) thereof that pending final disposition

of the matters herein involved by the Board, respondent NMU, its officers, representatives, agents, servants, employees, attorneys, and all members and persons acting in concert or in participation with it, be enjoined and restrained from the commission, continuation, or repetition of the acts and conduct set forth in Findings of Fact found to be in violation of the Act and acts or conduct in furtherance or support thereof, or like or related acts or conduct in the future.

---

46. The Court is mindful that the district courts must not, in conjunction with the Board's General Counsel, become the "actual focal points of unfair labor practice adjudications." McLeod v. Business Machine & Office Appliance Mechanics Conference Board, 300 F.2d 237, 242 (2d Cir.

1962). See generally the Court's disposition of the question of novelty in the face of Board precedent in *Business Machine & Office Mechanics, supra.* See also text accompanying note 2 *supra.* But see cases cited at note 11 *supra.*