Ivan C. McLEOD, Regional Director of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner-Appellee,

v.

NATIONAL MARITIME UNION OF AMERICA, AFL–CIO, Respondent-Appellant,

and

Seafarers' International Union of North America and its affiliates, including the Sailors' Union of the Pacific, Respondent.

No. 416, Docket 71–2039.

United States Court of Appeals, Second Circuit.

Argued Dec. 2, 1971.

Decided March 17, 1972.

Marvin Roth, Supervisory Atty., Peter G. Nash, Gen. Counsel, Julius G. Serot, Asst. Gen. Counsel, Washington, D. C., for appellee.

Stanley B. Gruber, Abraham E. Freedman, New York City, for appellant.

Schulman, Abarbanel, Perkel & McEvoy, New York City, for Seafarers.

Edward L. Coffey, Peter J. Schlesinger, John W. Ohlweiler, Simpson, Thacher & Bartlett, New York City, for Prudential Grace Lines.

Before LUMBARD, WATERMAN and FEINBERG, Circuit Judges.

WATERMAN, Circuit Judge:

This is an appeal from Judge Pierce's decision and order in the United States District Court for the Southern District of New York granting, after a full hearing, temporary injunctive relief pursuant to Section 10($l$) (29 U.S.C. § 160($l$)) of the National Labor Management Relations Act, as amended,[1] against the appellant, National Maritime Union of America, AFL–CIO (NMU), restraining that union from refusing to man two ships owned by Prudential-Grace Lines, Inc. (Prudential-Grace). The injunction was granted upon petitions filed by Ivan C. McLeod, the Regional Director of the Second Region of the National Labor Relations Board. The petitions were based upon and followed after a charge filed with the Board by Prudential-Grace Lines in which Prudential-Grace alleges that the Seafarers' International Union of North America (SIU)[2] and NMU had engaged in, and were engaging in, unfair labor practices within the meaning of Section 8(b) (4) (i) (D) or Section 8(b) (4) (ii) (D) of the Act (29 U.S.C. § 158(b) (4) (i, ii) (D)). Judge Pierce held that the Regional Director had reasonable cause to believe that NMU was violating or had

---

1. 29 U.S.C. § 160($l$), in pertinent part, reads as follows:

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (A), (B), or (C) of section 158(b) of this title, or section 158(e) of this title or section 158(b) (7) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law: . . . . In situations where such relief is appropriate the procedure specified herein shall apply to charges with respect to section 158(b) (4) (D) of this title.

2. Also named as respondents were affiliates of SIU, including the Sailors' Union of the Pacific.

violated the Act, and, in an opinion dated October 12, 1971, reported in 334 F. Supp. 34 (SDNY 1971), enjoined that union (334 F.Supp. 47) from refusing to man the ships pending a final disposition of the pertinent proceedings before the National Labor Relations Board.

The issues which were before Judge Pierce reach back into December 1969, when Prudential Steamship Company, Inc. acquired 100% of the stock of Grace Line, Inc., and changed the latter's name to Prudential-Grace Lines, Inc. Shortly thereafter Prudential transferred all of its ships to its newly acquired subsidiary. Prior to these transactions Prudential, which had operated solely from the east coast, had been a party to a collective bargaining agreement with NMU. Grace Line, Inc., however, had an operating government subsidy which covered two fleets: one fleet based on, and operating from, the east coast, whose unlicensed personnel had been represented by NMU; the other fleet based on, and operating from, the west coast, whose unlicensed personnel had been represented by SIU.

The present dispute was triggered in March 1971, when Prudential-Grace decided for economic reasons to transfer two ships from the east coast to the west coast.[3] Prior to the acquisition those ships, the S.S. "Oceanjet" and the S.S. "Seajet," had been part of the Prudential fleet. When NMU was informed of the proposed transfer its president demanded that the ships continue to be manned by NMU after they reached the west coast. SIU, understandably unenthusiastic about such a plan, asserted, through its vice-president, that SIU would man them. Thus Prudential-Grace finds itself caught between two

unions: NMU refuses to sail the ships to the west coast unless Prudential-Grace agrees to its demand that it represent the crews after the transfer, and SIU may back up, with a strike if necessary, its demands to represent them.[4]

In response to this situation, on June 23, 1971, Prudential-Grace filed with the National Labor Relations Board its charge that the two unions were acting in violation of Section 8(b)(4)(i)(ii) (D) of the Act. That section makes it an unfair labor practice for a labor organization or its agents:

(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\* \* \* \* \* \*

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work.

It is well settled that those provisions were intended to apply to disputes be-

---

3. It might be noted that prior to this time two ships, originally of Grace Line, Inc., had been transferred from the west coast to the east. SIU members manned the ships as far as the east coast. Upon arrival representation of the personnel was transferred to NMU. As was pointed out by the NLRB in National Maritime Union AFL–CIO, 194 N.L.R.B. No. 199

(1972), at page 6, "Based upon prior custom and practice, the Employer assumed that the transfer of the [ships] would result in SIU crews operating these vessels."

4. There was an intimation of this by counsel for SIU in his closing argument before Judge Pierce.

tween "two or more employee groups claiming the right to perform certain work tasks . . . ." N.L.R.B. v. Radio and Television Broadcast Engineers Union, 364 U.S. 573, 586, 81 S.Ct. 330, 338, 5 L.Ed.2d 302 (1961); see also Highway Truckdrivers & Helpers, Local 107, Etc., 134 N.L.R.B. 1320, 1322 (1961). Its purpose was to see that such disputes are "settled peaceably and without work stoppages." McLeod for and on Behalf of N.L.R.B. v. Truck Drivers, etc., Local, 210 F.Supp. 769, 772 (SDNY 1962). The Regional Director of the NLRB determined that there was in fact reasonable cause to believe that the two unions were acting in violation of that section of the Act and petitioned the court below for 10(*l*) injunctions to preserve the *status quo* pending final determination of the matter before the Board.

The district court correctly construed its role to be a narrow one. Within the meaning of the statute the court had to make two determinations: first, "whether the [Regional] Director could have 'reasonable cause to believe' that the charges filed were true," Douds v. Milk Drivers & Dairy Employees Union, Local 584, 248 F.2d 534, 537 (2 Cir. 1957) and, second, whether the issuance of an injunction would be "just and proper" under the circumstances. While Judge Pierce ruled that the Regional Director had not satisfied his burden of showing "reasonable cause to believe" that SIU had violated the statute, he deemed that it was appropriate to enter an injunction against NMU. NMU had maintained that its actions were within the outside perimeter of the "work preservation" defense as that defense had been recently defined by the Board in its decision in International Longshoremen's & Warehousemen's Union Local 8 (Waterways Terminals Co.), 185 N.L.R.B. No. 35. The court held, however, that the motive for the union's action was not merely to protect the jobs of any dislocated members of the crews of the vessels, but was also to protect the job opportunities of its entire hiring hall, and, because of this, NMU's actions

were not within the scope of the "work preservation" defense as defined. Moreover, the court wisely declined to broaden the scope of the defense, or to adopt NMU's concept of its geographical domain. We agree with the approach taken by Judge Pierce and will do little more in this opinion than endorse the lower court's reasoning.

After the decision below was handed down and while the case had been *sub judice*, the National Labor Relations Board, pursuant to Section 10(k) of the Act, conducted a hearing on the merits of the jurisdictional dispute which had given rise to the unfair labor practice charge filed by Prudential-Grace. In its decision dated January 20, 1972, and reported in 194 N.L.R.B. No. 199 the Board determined that the work in dispute "should be assigned to the unlicensed seamen who are members of or represented by SIU" and that NMU "is not entitled by means proscribed by Section 8(b) (4) (D) of the Act to force or require Prudential-Grace Lines, Inc., to assign such work to individuals represented by the aforesaid labor organization."

Before reaching the merits of the controversy the Board was required to decide whether there was reasonable cause to believe that Section 8(b) (4) (D) of the Act had been violated. As in the district court, the determination of that issue turned upon whether NMU's actions were protected by the "work preservation" defense. To quote the Board at page 11 of its decision:

. . . [T]his is not a case in which NMU is attempting to protect and preserve work which has traditionally been performed by its members. Rather, NMU is attempting to expand its traditional domain to acquire work which it never performed. . . . Thus, we conclude that NMU's work preservation argument is without merit, . . . .

The Regional Director has not informed us that NMU has decided to abide by

the Board's order or to comply with the Board's 10(k) determination; therefore the appeal from the 10(l) injunction issued by the district court upon the petition of the Board's Regional Director has not been mooted by the Board's disposition of the 10(k) proceeding which it began following the unfair labor practice charge presented to it by Prudential-Grace.

If NMU declines to comply, the Board's General Counsel normally initiates proceedings to determine whether NMU has committed or is committing "unfair labor practices," and, by its specific terms,[5] the court's injunction, if justifiably issued, should be continued until all matters herein involved have reached "final disposition" by the Board.

Inasmuch as we have not been informed that there has been any "final disposition" by the Board we turn to an examination of the justifiability of the issuance of the injunction in the light of the two contentions pressed by NMU on this appeal. First, it is claimed that the district court erred in holding that the "work preservation" defense is not broad enough to cover NMU's desire to preserve job opportunities for its entire hiring hall. Second, it is contended that any injunction, in order to preserve the *status quo* mandated by the statute, should have been, pending final disposition of the matters before the Board, conditioned on the continued employment of NMU seamen aboard the two ships.

The primary task of the trial court in a 10(l) case is to determine "reasonable cause" by examining the facts of the case with reference to the law as it had been developed by the Board and its reviewing courts. McLeod for and on behalf of N.L.R.B. v. Business Machines and Office App. Mech. Conf. Bd., 300 F. 2d 237 (2 Cir. 1962). In any such determination, as was stated in McLeod for and on Behalf of N.L.R.B. v. Local

25 I.B.E.W., 344 F.2d 634, 638 (2 Cir. 1965):

> When relief is sought under § 10(l), the Board, rather than the federal district court, remains the "primary fact finder" and "primary interpreter of the statutory scheme," Schauffler for and on Behalf of N.L.R.B. v. Local 1291, Int'l Longshoreman's Ass'n, [3 Cir.] supra, 292 F.2d [182] at 188, subject, of course, to judicial review by a court of appeals pursuant to § 10(e) and § 10(f).

As was pointed out by the court below, any expansion of the perimeters governing the statute's application is, first, the province of the Board and is not in the first instance a proper matter for the district court to resolve.

■ The facts of the present case and the current applicable law support the lower court's decision to issue its injunction. The situation in which Prudential-Grace finds itself is analogous to that of the employer in NLRB v. Radio and Television Broadcast Engineers Union, *supra*, which was described in the following terms on page 582 of 364 U.S., on page 336 of 81 S.Ct. of the opinion in that case:

> [H]ere, as in most situations where jurisdictional strikes occur, the employer has contracted with two unions, both of which represent employees capable of doing the particular tasks involved. The result is that the employer has been placed in a situation where he finds it impossible to secure the benefits of stability from either of these contracts, not because he refuses to satisfy the unions, but because the situation is such that he cannot satisfy them.

Prudential-Grace cannot continue its business in an economically satisfactory manner, for it cannot transfer its ships to the west coast without conflict with one of the unions. The Supreme Court phrased this dilemma in language par-

---

5. The district court's injunction is found at 334 F.Supp. 34, at 47.

ticularly appropriate to this situation: the employer is "caught 'between the devil and the deep blue . . . .'" NLRB v. Radio and Television Broadcast Engineers Union, *supra* at 575, 81 S.Ct. at 332. And, as we have pointed out above, Congress intended that Section 8(b) (4) would calm such troubled industrial waters.

▮ NMU relies upon a broad interpretation of the work preservation defense to justify its refusal to man the two ships without Prudential-Grace's guaranty of continued representation of the crews once the ships are transferred. It contends that its action to preserve not only the jobs for those of its member-employees who would be actually dislocated from employment by the SIU member-employees but also the job opportunities for all of its members using its hiring hall lies within the ambit of that defense. In view of the interpretation given to the defense in two recent cases decided by the National Labor Relations Board, we cannot agree. In International Longshoremen and Warehousemen Local 8 (Waterways Terminals Co.), *supra*, the Board held that the "work preservation" defense was a valid defense when the Union acted to preserve work for the union members *actually employed,* but the case is significant because of the manner in which the Board distinguished its prior holding in International Longshoremen's Ass'n, Great Lakes District, AFL–CIO (Lawrence Erie Co.), 158 N.L.R.B. 1687 (1966). To quote the Board at page 6 of its opinion in *Waterways*:

> Our decision in Lawrence Erie, 158 NLRB 1687, relied on by our dissenting colleagues, is clearly distinguishable. As heretofore indicated, the Union's demands in the instant case merely sought employment of the dislocated workers and continued application of the bargaining agreement covering them. There was no claim that IBU's members be replaced by employees other than those who were terminated. In Lawrence Erie, on the other hand, at least one of the objectives of the striking union was to require the Employer to accede to the union's jurisdictional claim by assigning the disputed work to applicants furnished from the union's hiring hall . . . .

The fact-situation in *Lawrence Erie* involved a successor employer which had replaced the predecessor's employees with members of a different union. The union which represented the predecessor's employees (the ILA) demanded not only the assignment of the lost jobs but also demanded that the employer use the ILA hiring hall. In finding that the ILA had violated 8(b) (4) (D) the Board pointed out at page 1690:

> . . . [T]hese actions show that at least one of the ILA's objects was to force Lawrence Erie to replace its District 50 employees with ILA members and to hire new employees only through the ILA hiring hall, an object based on the claim that work at the terminal was within the ILA's jurisdiction. Picketing for such an object is prohibited by Section 8(b) (4) (D).

In the present case, the court found, and the finding is not disputed, that "NMU is asserting jurisdiction over the jobs involved, rather than preserving 'employment of those presently working.' [footnotes omitted]" 334 F.Supp. at 44. As such the union seeks to expand the scope of the work preservation defense beyond the scope of that defense as it has been defined by the Board.

NMU's main argument, however, seems to be based upon its contention that the nature of the seagoing shipping industry mandates that the work preservation defense when applied to that industry be construed broadly so as to cover the job opportunities of all of the

members of its hiring hall. Particular stress is placed upon the nature and the requirements of the hiring hall. We do not rule on this contention but point out, as did the district court, that the proper forums for expanding the defense is, first, the National Labor Relations Board and, then, its reviewing courts. McLeod for and on Behalf of N.L.R.B. v. Local 25, I.B.E.W., *supra*; Schauffler for and on Behalf of N.L.R.B. v. Local 1291, I.L.A., *supra*.

■ NMU's second contention may be dealt with briefly. It points out, as did the court below, that the purpose of a 10(*l*) injunction is to preserve the *"status quo"* of a labor dispute pending the final determination of the matter before the Board. In its view the *status quo* to be preserved is the manning of the ships by NMU. Therefore, it argues that the injunction should be modified to reflect its claim. The Regional Director points out, however, that at all times hitherto the ships on the west coast have not been manned by NMU but by SIU. Moreover, any interpretation of the *status quo* to be preserved must be made with an eye to the statutory policies involved, and here the statute is aimed at protecting employers from union unfair labor practices. Very much in point is the Ninth Circuit opinion in Henderson for and on Behalf of N.L.R.B. v. International Union of Op. Eng., Local 701, 420 F.2d 802 (9 Cir. 1969). There, at 809, the court stated:

> Moreover, if *status quo* is a consideration at all in section 10(*l*) cases, the *status quo* to be preserved is the employer's right to make work assignments without being subjected to continuing strike pressure, pending a Board decision in the unfair labor practice proceedings.

The lower court decision and order is affirmed.